**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION**

**ALVIN WAYNE BERRY,**

**Petitioner,**

**vs.** **Case No. 4:11cv340-MP/CAS**

**KENNETH S. TUCKER, Secretary, Florida Department of Corrections,**

**Respondent.**

**_____________________________/**

**REPORT AND RECOMMENDATION TO DENY § 2254 PETITION**

On July 12, 2011, Petitioner Alvin Wayne Berry, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 1. After direction by this Court, Petitioner filed an amended § 2254 petition on November 16, 2011. Doc. 10. Petitioner challenges his conviction and sentence imposed by the Third Judicial Circuit, Taylor County, on May 7, 2007, following a jury trial. *Id*. Respondent filed an answer to the petition on May 17, 2012. Doc. 18. Petitioner filed a reply on June 27, 2012. Doc. 19.

The matter was referred to the undersigned United States Magistrate Judge for issuance of all preliminary orders and any recommendations to the district court

regarding dispositive matters, pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration, the undersigned has determined no evidentiary hearing is required for the disposition of this matter. *See* Rule 8(a), R. Gov. § 2254 Cases. The pleadings and attachments before the Court show that the petition should be denied.

**Background and Procedural History**

By information filed October 6, 2005, in the Third Judicial Circuit, Taylor County, in case number 05-257CF, the State of Florida charged Petitioner Alvin Wayne Berry with three counts in connection with events that took place on August 29, 2005, involving the death of Raymond Sellers, who was struck and killed while riding a bicycle: (1) driving under the influence (DUI) of alcohol causing or contributing to the cause of manslaughter, a second degree felony, in violation of section 316.193, Florida Statutes; (2) leaving the scene of an accident involving death, a second degree felony, in violation of section 316.027, Florida Statutes; and (3) driving while license revoked resulting in death, a third degree felony, in violation of section 322.34(3), Florida Statutes. Doc. 18 Ex. A at 1-2. Petitioner proceeded to a jury trial in March 2007, during which many witnesses testified. *See id.* Exs. D, E, F (trial transcript). Petitioner testified in his defense. *See id.* Ex. G at 768-849. The jury found him guilty as charged on all three counts. *Id*. Ex. H at 968-70. The state trial court adjudicated him guilty and, on May 7, 2007, sentenced him to twenty-five years in prison, as a habitual felony offender, on Count 1; fifteen years in prison on Count 2; and five years in prison on Count 3, with all sentences to run concurrently. *Id*. at 1010, 1034-35; Doc. 18 Ex. C at 369-79.

Petitioner timely appealed his judgment and sentence to the First District Court of Appeal (DCA), and that court affirmed the case, 1D07-2443, without an opinion on February 7, 2008. *Id*. Ex. L; *see* Berry v. State, 973 So. 2d 1126 (Fla. 1st DCA 2008) (table). The mandate issued February 25, 2008. Doc. 18 Ex. M.

On September 10, 2008, Petitioner filed a petition for writ of habeas corpus in the First DCA, alleging ineffective appellate counsel, assigned case number 1D08-4595. Doc. 18 Ex. N. Without a response from the State, the First DCA denied the petition on the merits on November 6, 2008. *Id*. Ex. O; *see* Berry v. State, 994 So. 2d 1181 (Fla. 1st DCA 2008).

On June 19, 2008, Petitioner filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 in the state trial court. See Doc. 18 Ex. T at 87. Petitioner filed an amended motion in March 2009. *Id.* Ex. S. The state post-conviction trial court summarily denied the amended motion by order rendered October 26, 2010. *Id*. Ex. T at 87-97. Petitioner appealed to the First DCA and filed an Initial Brief, in case number 1D10-6054. *Id*. Ex. U. The State did not file an Answer Brief. *Id*. Ex. V. The First DCA affirmed the case without an opinion on February 15, 2011. *Id*. Ex. W; *see* Berry v. State, 57 So. 3d 848 (Fla. 1st DCA 2011) (table). Petitioner filed a motion for clarification, which the First DCA denied. Doc. 18 Ex. X. The mandate issued April 6, 2011. Doc. 18 Ex. Y.

In the meantime, Petitioner had also filed a petition for mandamus in the First DCA, assigned case number 1D10-4675, seeking to compel the state post-conviction trial court to rule on his then-pending Rule 3.850 motion. Doc. 18 Ex. P. The First DCA

ultimately dismissed that petition as moot by order dated November 3, 2010, because the trial court had ruled on the Rule 3.850 motion. *Id*. Ex. Q.

As indicated above, Petitioner Berry filed his pro se § 2254 petition in this Court on July 12, 2011. Doc. 1. In his petition, as amended, Berry raises four grounds:

> (1) The state trial court erred in admitting evidence regarding Berry's blood alcohol level, which deprived him of his due process rights in violation of the Fifth, Sixth, and Fourteenth Amendments. Doc. 10 at 4.
>
> (2) Trial counsel rendered ineffective assistance by failing to investigate and make use of deposed State witnesses' testimony during the investigation, in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. *Id*.
>
> (3) Trial counsel rendered ineffective assistance by failing to object to improper closing arguments and misconduct of the prosecutor, in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. *Id*. at 5.
>
> (4) Trial counsel rendered ineffective assistance, in violation of the Sixth and Fourteenth Amendments, by preventing Berry from an opportunity to view the State's evidence against him, precluding his assistance in his defense. *Id*.

Each ground is analyzed below.

## **<u>Analysis</u>**

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody. Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See* Williams v. Taylor, 529 U.S. 362 (2000); Gill v. Mecusker, 633 F.3d 1272 (11th Cir. 2011).

If a state prisoner's habeas petition "includes a claim that has been 'adjudicated on the merits in State court proceedings,' § 2254(d), an additional restriction applies." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). The federal court may not grant relief unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen, 131 S.Ct. at 1398 (quoting Harrington v. Richter, 131 S.Ct. 770, 786 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1388.

**Ground 1: Trial Court Error in Admitting Blood Alcohol Level Evidence**

As referenced above, in his first ground, Petitioner Berry asserts the state trial court erred in admitting evidence regarding his blood alcohol level (BAL), depriving him of his due process rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. Doc. 10 at 4. Berry states that he "allegedly . . . had a physical altercation that followed a suspected role in a fatal traffic accident" and he "sustained injuries from the physical altercation and went to hospital." *Id*. Law enforcement officers arrived at the hospital before he did "and yet failed to comply" with section 316.1933, Florida Statutes, to obtain a legal blood draw once the officers suspected Berry was intoxicated. *Id*. Berry asserts his constitutional rights were violated when law enforcement officers "deliberately acted in bad faith/neglecting to utilize the mandated 'legal blood draw' to obtain reliable results of Petitioner's blood alcohol level." *Id*.

In the answer, Respondent adopts the State's statement of the facts from the Answer Brief filed in the direct appeal. *See* Doc. 18 at 3. Respondent explains that blood was drawn from Berry at the hospital, at the request of the police officers, and it was tested for BAL but without following the procedure in section 316.1933, Florida Statutes, which establishes the predicate for admission and invokes the presumption of impairment in section 316.1934, Florida Statutes. Doc. 18 at 3. Respondent asserts that this ground was not exhausted because, before the trial court, the only federal claim Berry raised was that admission of the hospital's BAL written test results violated Crawford v. Washington, as it prevented confrontation of "those who did the analysis." *Id*. at 4. Respondent asserts that, although trial counsel obtained a ruling on the Crawford issue, no point concerning this was raised in the direct appeal. *Id*. Because

this ground is not exhausted, it is procedurally barred as Petitioner cannot have another direct appeal. *Id*.

Respondent further argues Petitioner's argument in this ground is ambiguous. *Id*. at 5-6. Respondent asserts that, to the extent Petitioner alleges a federal constitutional violation because the police did not use the "legal blood draw" procedure set forth in the state statute, habeas relief cannot be based on an error of state law. *Id*. at 5-6. Respondent also points out that, on direct appeal, the State expressly agreed in the answer brief that it did not satisfy the requirements of section 316.1933, Florida Statutes, concerning the blood draw, and argued the evidence was properly admitted under the common law. *Id*. at 6. The jury was not instructed on the statutory presumption of impairment based on BAL and failure to comply with section 316.1933 was not an issue; rather, the trial court instructed the jury that the State had to prove Berry's BAL was .08 or above. *Id*. Respondent indicates it has not found, and Petitioner has not offered, a U.S. Supreme Court decision sufficient similar to rise to clearly established law compelling relief. *Id*. at 6-7. Respondent concludes Petitioner's trial was not fundamentally unfair by admission of the BAL evidence. *Id*. at 7.

In his reply, Berry asserts Respondent "has overlooked the root of Petitioner's argument in the trial court and following appeal, was that the State failed to establish predicate of the analysis reliability in the absence of testimony where Petitioner could rightfully confront and cross-examine in accordance to his Sixth Amendment rights." Doc. 19 at 3. Berry notes "[t]he State mildly concedes that Petitioner's argument in trial and appeal allude one another." *Id*. at n.1. Berry asserts that "[b]y design these

aforementioned rights embrace Florida Statute § 316.1933, which intent compliments the holding of Crawford v. Washington, 541 U.S. 36 (2004)," and, thus, "this claim is ripe for this Court's review." *Id*. at 3. Berry asserts that "the thrust of this claim stands square upon the violations of Petitioner's Equal Protection and Due Process rights to confront and cross-examine which notably, were offended when breaching the requirements of Florida Statute § 316.1933." *Id*. Concerning Respondent's argument that the BAL evidence was admitted under the common law, Berry asserts this "fails because the State failed to meet the common law burden of admissibility" and cites Bender v. State, 382 So. 2d 697 (Fla. 1980). Doc. 19 at 4. Berry also indicates that he did cite a U.S. Supreme Court decision, United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 2318 (1975), and "that analogy is enough to balance the level of clearly established law pursuant to § 2254." Doc. 19 at 5. Berry also cites Hartge v. McDonough, 210 F. App'x 940, 945 (11th Cir. 2006), in support of his claim. Doc. 19 at 5-6.

As Respondent points out, to the extent Petitioner here challenges the trial court's ruling on the Crawford issue, Berry did not raise that point in his direct appeal and, thus, it is not exhausted and is procedurally barred. Doc. 18 Ex. J (Initial Brief filed in direct appeal). Petitioner's argument in this ground seems to be, however, that because the officers did not comply with section 316.1933 in obtaining the blood draw used to test Berry's BAL, the BAL evidence was not admissible in his trial. This is the point raised in Berry's Initial Brief filed in his direct appeal: "The Court erred in admitting evidence regarding Berry's blood alcohol level at the time of the accident and

afterwards." Doc. 18 Ex. J at i. In particular, in that brief, appellate counsel argued that Berry's blood was taken at the hospital by a clinical lab technologist, Cora Hernandez, "apparently as a matter of hospital routine and for use in the 'medical management of the patient.'" *Id*. at 9 (quoting trial testimony of Hernandez (Doc. 18 Ex. E at 512, 517)). Counsel argued that Hernandez "prepared her report based on the results produced by an instrument whose analysis was 'never designed to be used in a court of law'" and the results, as testified to by Dr. Bruce Goldberger, indicated Berry had a BAL between .164 and .205. *Id*. at 9-10. Counsel argued that because Berry's blood was not obtained pursuant to the procedure in section 316.1933, Florida Statutes, the State had to establish a more extensive predicate than provided in Robertson v. State, 604 So. 2d 783 (Fla. 1992), for the admission of the evidence, and the State failed to do that. *Id*. at 10-13. Accordingly, counsel concluded the trial court erred in admitting the results of Hernandez's analysis. *Id*. at 8-14. The Initial Brief relies only on state law and authority, and does not cite any federal authority. *See id.* at ii.

To the extent the argument Berry raises in Ground One is the point he presented on direct appeal, as the State explained in the appellate Answer Brief, Berry's trial counsel did not preserve this argument in the trial court. *See* Doc. 18 Ex. K at 8. In particular, in a pretrial motion to suppress or motion in limine, defense counsel sought to exclude evidence of Berry's BAL or controlled substances obtained from a blood sample taken when Berry was a patient at Doctors Memorial Hospital (DMH). *Id*. Ex. C at T. 6 (transcript of motion hearing held May 31, 2006); Ex. T at 245-50 (written motion). The State, in response to the motion, stipulated that Berry's blood was not drawn pursuant

to law enforcement directive, that is it was not “law enforcement blood” or “legal blood.” *Id*. Ex. C at 21-22. Defense counsel sought to exclude from evidence the test results document from DMH reflecting Berry’s BAL and based his argument on Crawford v. Washington. *Id*. at 22-36; *Id*. Ex. T at 245. Counsel noted in the motion, that “[t]he laboratory report . . . specifically contains a paragraph that states, ‘Chain of custody is not maintained; therefore, DMH alcohol results are intended for the medical management of the patient only and not to be used for legal purposes.’” *Id*. Ex. T at 246. Defense counsel acknowledged, however: “Bottom line is, if the state can produce the witnesses that can show an evidentiary chain, somebody I can cross-examine, somebody I can deal with on the evidence, and has relevant answers to the questions that you and I and the State of Florida typically see in a criminal trial, this motion is probably moot.” *Id*. at 33. The prosecutor argued the document was a medical record and, therefore, was admissible as a business record if the predicate for a business record is established. *Id*. at 37-41. The prosecutor argued “very clearly, very plainly by Crawford’s very own words, Crawford does not apply to business records, period.” Id. at 38; see id. at 45 (“So bottom line, the motion I believe should be denied, because Crawford does not in any way affect medical records or business records, and the medical records are business records and, therefore, are admissible.”). The prosecutor explained he was going to call as witnesses the record custodian, the person who performed the BAL test, and an expert toxicologist. *Id*. at 42-43. The trial court denied the motion, having been “persuaded by the arguments by counsel for the state the

Crawford case does not exclude business records, medical records which are in fact business records." *Id*. at 48. The written order provides:

> ORDERED and ADJUDGED that the Defendant's motion is DENIED. The hospital records of Doctor's Memorial Hospital are business records of Doctor's Memorial Hospital. Business records are admissible under the authority of Baber v. State, 775 So. 2d 258 (Fla. 2000). Crawford v. Washington, 541 U.S. 36 (2004), does not prevent the introduction of business records.

*Id.* Ex. T at 252.

Further, in a subsequent pretrial motion in limine, filed November 28, 2006, Berry sought to exclude any reference to "a toxicology report from Doctors Memorial Hospital dated August 30, 2005 indicating a positive result for cocaine and THC." *Id*. Ex. B at 208. The motion acknowledges the DUI manslaughter charge against Berry, explains the Office of the State Attorney has obtained a copy of Berry's medical records from his treatment at DMH for injuries he sustained in a fight, and further explains these records include a toxicology report dated August 30, 2005, "where a rapid drug screen test of the Defendants [sic] urine resulted in a listing of 'positive' on the toxicology report for cocaine and THC." *Id*. The motion indicates the Office of the State Attorney has listed Dr. Bruce Goldberger, Ph.D., as a witness and his deposition was taken November 13, 2006. *Id*. The motion further indicates Dr. Goldberger "is an anticipated witness for the State of Florida to offer an expert opinion regarding the alcohol level of the Defendant at the time of the vehicle crash" and Dr. Goldberger "would be unable to establish more than speculation as to the impact of cocaine or THC on the Defendant's physical condition at the time of the vehicle crash." *Id*. at 208-09. The motion argues the State

has not alleged cocaine or THC as an element in Count 1, evidence regarding cocaine or THC is not relevant in the case, and such evidence should be excluded pursuant to section 90.403, Florida Statutes. *Id*. at 209-11. The motion does not seek to exclude any BAL test results. *See id.* at 208-11. The trial judge held a hearing on December 18, 2006, and subsequently entered a written order on January 8, 2007, indicating the motion "is taken under advisement and if the case proceeds to trial the Court will revisit this issue at that time." *Id*. at 214.

A review of the trial transcript reflects that no objections concerning the admissibility of Berry's BAL level test result were raised during the testimony of Glennis Louque, the assistant manager of the DMH laboratory; Cora Hernandez, the DMH clinical laboratory technologist who drew and tested Berry's blood; and Dr. Goldberger, an expert witness regarding blood alcohol and toxicology. *See* Doc. 18 Ex. E at 472-500 (trial testimony of Louque), Ex. E at 504-41 (trial testimony of Hernandez), Ex. F at 546-92 (trial testimony of Goldberger). The only objections concerned questions asked of Hernandez on cross about statements on the lab test results report, when defense counsel asked whether "what we are doing today [is] a legal purpose" and the prosecutor objected that an answer would call for a conclusion. Doc. 18 Ex. E at 517; *see id.* at 536. Defense counsel asked this question because the lab report contained a statement that "alcohol results are intended for the medical management of the patient" and are "not to be used for legal purposes." *Id*. at 517. The trial court sustained these objections. *Id*. at 517, 536. In addition, during the direct examination of Dr. Goldberger, the prosecutor asked a hypothetical and defense counsel objected, not to the

hypothetical, but that the prosecutor had inaccurately characterized a statement by another witness (Keith Peacock) concerning whether Berry had anything else to drink before arriving at the hospital and having his blood drawn. Doc. 18 Ex. F at 572-73. The trial court overruled the objection and noted the witness was subject to cross-examination. *Id.* at 573.

Therefore, no argument concerning the admissibility of the BAL test results was preserved in the trial court. Even on the merits, however, as the State explained in the answer brief filed in Berry's direct appeal, the prosecutor established a sufficient predicate for the admission of this evidence under the common law. *See* Doc. 18 Ex. K at 9-16; Ex. E at 472-500 (trial testimony of Louque), Ex. E at 504-41 (trial testimony of Hernandez), Ex. F at 546-92 (trial testimony of Goldberger). *See also* Robertson, 604 So. 2d at 791; State v. Bender, 382 So. 2d 697 (Fla. 1980); State v. Miles, 775 So. 2d 950, 956 (Fla. 2000) ("As found in Bender and later explained in Robertson, prior to the implied consent law, the following three-prong predicate had to be established in order to admit test results: (1) the test was reliable, (2) the test was performed by a qualified operator with the proper equipment, and (3) expert testimony was presented concerning the meaning of the test."). Moreover, to the extent Berry's claim here rests on state law grounds concerning the trial court's admission of evidence, it is not sufficient to warrant review or relief by a federal court. *See, e.g.*, Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); *see also* Link v. Tucker, 870 F. Supp. 2d 1309, 1325 (N.D. Fla. 2012) (Order adopting Report and Recommendation to deny § 2254 petition: "It is well established that a challenge to a state trial court's ruling on a question of state law, for example, an

evidentiary ruling, is cognizable on federal habeas only to determine whether the alleged error was so critical or important to the outcome of the trial to render the trial fundamentally unfair."); Jones v. McNeil, No. 4:09cv54-RH/WCS, 2013 WL 5504371, at *7 (N.D. Fla. Oct. 1, 2013) ("A federal petitioner cannot pursue a Due Process claim when the underlying issue was raised in state court only as a state evidentiary issue without asserting a federal constitutional issue.").

Based on the foregoing, Berry did not exhaust in the state court any federal constitutional argument raised in this ground and, therefore, this ground is procedurally barred. Even assuming Berry exhausted this ground, he has not demonstrated a basis for federal habeas relief. The State established a common law predicate for the admission of the BAL evidence and testimony and did not rely on any statutory presumptions of impairment. Berry has not shown the state trial court's admission of evidence and testimony concerning his BAL resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent; or that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). This ground should be denied.

In his remaining three grounds, Berry alleges claims of ineffective assistance of counsel (IAC). In Strickland, the U.S. Supreme Court adopted a two-part test for such claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. To demonstrate ineffectiveness, a "defendant must show that counsel's performance fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

If a state prisoner's habeas petition "includes a claim that has been 'adjudicated on the merits in State court proceedings,' § 2254(d), an additional restriction applies." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). The federal court may not grant relief unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen, 131 S.Ct. at 1398 (quoting Harrington v. Richter, 131 S.Ct. 770, 786 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). This Court's review "is limited to the record that

was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1388.

For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schiro v. Landrigan, 550 U.S. 465, 473 (2007)). "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* It is a "doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard." *Id.*

**Ground 2: IAC – Failure to Investigate and Use Deposed State Witnesses**

In his second ground, Berry asserts that his trial counsel provided ineffective assistance because he failed to investigate and use deposed State witnesses' testimony. Doc. 10 at 4. Berry states that, before his trial, he advised his counsel that the vehicle involved in the accident belonged to "Willis" and State witness Smith also testified that the assailant drove a "little white truck" belonging to "Willis." *Id*. When defense counsel deposed State witnesses White, Lucado,[1] and Willis, however, he neglected to ask about the white truck's involvement and did not investigate the truck's

[1] This reference to "Lucado" appears to refer to "Karen Lucado" who was one of the eyewitnesses to the collision and who also appears to be referred to as "Karen Louque" in portions of the trial transcript. *See, e.g.*, Doc. 18 Ex. F at 653, 660, 668, 673. At trial, she testified her name was Karen Kay Lucado, so this Court will refer to her accordingly. *See id.* Ex. D at 303, 325.

whereabouts. *Id*. Berry asserts that by failing to investigate Willis and the white truck, and failing to investigate "the participant's concealment of switching vehicles," defense counsel did not provide effective assistance. *Id*. In his supporting memorandum, Berry further alleges he advised defense counsel to ask why the white truck was not reported to the police, so they could determine if the truck was the vehicle that struck the victim. Doc. 11 at 9-10.

As Respondent explains, in the second ground of his Rule 3.850 motion, Berry asserted White and Lucado left the scene after assaulting him, changed vehicles, and then returned to talk to law enforcement officers; however, defense counsel did not investigate this. Doc. 18 Ex. R at 30-31. Berry also asserted that, in deposition, Smith said White, Lucado, and Willis were in a truck, but White said in deposition that the three of them were in a car. *Id*. at 31. Berry asserted in his Rule 3.850 motion that the testimony about them being in a car "is clearly false." *Id*. at 32. Berry indicated he believed defense counsel should have challenged this testimony. *Id*. Berry also indicated in his Rule 3.850 motion that he "still believes the vehicle driven by either Michael Willis or Jimmy R. White struck the victim while chasing Mr. Berry and confronting him again." *Id*. at 33. Berry asserted "[t]hese 'key' witnesses rehearsed their stories to blame Mr. Berry, and falsely presented their story to an ill informed jury." *Id*. Berry asserted that if defense counsel had properly investigated, and "did his job to impeach, and show the witnesses were biased and untruthful, it is highly unlikely that Mr. Berry would have been convicted of DUI manslaughter." *Id*. Berry concluded that if he had run over the victim after the victim was already fatally injured, then Berry is

innocent of DUI manslaughter. *Id*. at 38. Respondent asserts that nothing in Berry's § 2254 petition refutes the state post-conviction trial court's findings, and defense counsel had a reasonable strategy in pursuing "a plausible theory" rather than one which was "farfetched." Doc. 18 at 10. Respondent further asserts that the alleged discrepancies pointed to by Berry would not have helped his defense.

In reply, Berry asserts "clearly established Federal law explains there can be no strategic decision when counsel fails to investigate their client's plausible and especially suggested defense." Doc. 19 at 7. Berry cites to House v. Balkcam, 725 F.2d 608 (11th Cir. 1984), and Wiggins v. Smith, 123 S.Ct. 2527 (2003). Doc. 19 at 7.

The state post-conviction court denied this claim, making the following findings:

> In Ground Two, the Defendant attempts to explain how the evidence shows the Defendant is actually innocent of the crime charged. The Defendant asserts that the evidence supports the finding that the victim was already laying on the ground on the road and, further, that someone else may have hit the victim first. Therefore, the Defendant contends that he may have hit the victim after he was already fatally injured and, therefore, innocent of DUI Manslaughter. The Defendant contends counsel was ineffective for failing to pursue this avenue of defense. The argument is without merit.
>
> First, arguments that the evidence does not support finding the Defendant guilty is not proper for a Rule 3.850 motion and, instead, should have been raised on direct appeal. Additionally, a claim for ineffective assistance of counsel can be denied if the record indicates that counsel was pursuing a defense that would have been inconsistent. State v. Williams, 797 So. 2d 1235, 1239 (Fla. 2001) (a voluntary intoxication defense was properly omitted by counsel when the theory of the case was that the defendant had not committed the alleged offense). Similarly, "[s]trategic decisions of counsel will not be second-guessed on collateral attack." Wilson v. Wainwright, 474 So. 2d 1162, 1163 (Fla. 1985).
>
> This Court concludes that the decision not to proceed on a theory that the victim had already been hit by someone else and was dead when

> the Defendant struck him was a strategic decision of counsel. Instead, the defendant's theory was that the Defendant did not know that he had hit the victim. To support this argument, the Defendant himself testified to this effect. *Transcript* 827. Furthermore, the argument that the victim had already been hit by another individual and was already dead when the Defendant struck him is farfetched. Because there was no reliable evidence to support this assertion, counsel's decision to pursue this theory did not constitute deficient performance. Accordingly, Ground Two is DENIED.

Doc. 18 Ex. T at 90-91.

The state post-conviction trial court's rulings, affirmed on appeal without opinion, are entitled to deference and are supported by the record. *See* Wright v. Sec'y of Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002). A review of pertinent portions of the trial transcript reflects support for the state post-conviction trial court's determination that the defendant's theory was that the Defendant did not know that he had run over someone. Indeed, in support of this argument, the Defendant himself testified to this effect. *See* Doc. 18 Ex. G at 799, 813-14; *see also id.* at 880 (defense counsel closing argument).

Further review of the trial transcript reflects significant testimony that Sellers was struck by Berry's van. White testified that he saw Sellers' bicycle at the Steinhatchee Lounge prior to the incident. Doc. 18 Ex. D. at 255. Lucado testified that Sellers passed them on his bicycle before they had a confrontation in the street with Berry; she had asked Sellers "to call the law." *Id*. at 316. Both White and Lucado testified that after the altercation with Berry, Berry got back in his van and White got back in Willis's vehicle. *Id*. at 262-63, 270; 315-16. Berry backed up his van, revved up the motor, proceeded to drive fast and straight toward Willis's vehicle, and then veered off the road around Willis's vehicle. *Id*. at 263-64, 270-71; 317. Both White and Lucado testified

they heard a crash after this and, when they turned around, they saw Sellers' bicycle but Sellers was not there; Berry drove away from the scene. *Id*. at 264-66, 271-72; 317-18. Both White and Lucado initially thought maybe Sellers had gone to get help or law enforcement because he may have witnessed the altercation. *Id*. at 266; 316, 318.

In addition, Timothy Roufa, a traffic homicide investigator with the Florida Highway Patrol at the time of the offense and the lead investigator in this case, testified at trial that he interviewed three witnesses, White, Lucado, and Willis. Doc. 18 Ex. F at 625, 652-53, 659. Roufa testified as to the area where the collision most likely occurred, depicted in a photograph he took. *Id*. at 626-27. He testified the road was in "pretty good shape" and was "of normal width for a residential neighborhood." *Id*. at 627. He testified that he was told by witnesses that there were two vehicles that were parked on the road at some point prior to the collision. *Id*. He testified that he took measurements and did not note anything of evidentiary value except in the area "primarily along the shoulder." *Id*. He testified that the victim, Sellers, and his bicycle were between three and seven feet off the road, in the grass, when the collision occurred. *Id*. at 632. He testified that the distance from the point of the collision to the point where Sellers' body was found was one half mile. *Id*. at 648. He testified that it was another half a mile to the point where Berry's van was left. *Id*. at 649. The prosecutor elicited testimony from Roufa that his interviews of witnesses assisted him in drawing the diagrams used in his direct testimony. *Id*. at 652. Roufa confirmed that "the position of this truck [containing the three witnesses: White, Lucado, and a third person, Michael Willis, who was deceased by the time of the trial] and this van

[belonging to Berry], the general position was based on what I was told by the witnesses" as well as "[t]he path of travel, indicating a back up itself." *Id*. at 653; *see id.* at 660, 668. Roufa further explained:

> However, when looking at the totality of the scene, the position where the vehicle traveled off of the roadway initially, where it returned to the roadway, and what I was able to determine the path of travel by the various gravel marks and debris on the shoulder, that demonstrates a certain – a trajectory, if you would, that would suggest that the vehicle wasn't taking evasive action, by traveling off the road.

*Id*. Roufa testified his traffic reconstruction was "based on conclusions from [his] observations, which tended to corroborate what [he] was told by the witnesses." *Id*. at 654. On cross, defense counsel clarified that the other vehicle "is the car that [the three witnesses" were supposed to have been in and Roufa answered, "That's the vehicle, yes, sir." *Id*. at 657. Defense counsel continued:

> Q. What kind of vehicle was it?
>
> A. I believe they said it was a car. I show a truck on there. That's the vehicle they were in when I interviewed them.
>
> Q. They told you it was a truck, is it what you are telling me?
>
> A. I can't recall what vehicle it was.
>
> Q. And the placement of that vehicle is based on what they told you; is that correct?
>
> A. That is correct.
>
> Q. We are going to come to what Mr. Phelps [the prosecutor] said a minute ago when he was talking to you, but the placement of the van is also based on what you were told, as far as where they were in the roadway?
>
> A. Yes.

*Id*. at 658. Roufa testified there were no tire marks on the road "[h]owever, it had been raining that evening, on and off." *Id*. at 660. Defense counsel challenged Roufa's traffic reconstruction based on the marks in the grass and the placement of the victim's bicycle. *Id*. at 662-72. Roufa testified that he did know know where the van was prior to the collision and all he knew, with regard to the initial position, was based on information from "Karen Louque" and Jimmy Ray White. *Id*. at 666; *see supra* n.1. In response to defense counsel's questions about the placement of the bicycle, Roufa testified he "would not speculate as to where the bike was prior to where it was struck" because Roufa did not know where it was. Doc. 18 Ex. F at 672. The testimony continued:

> Q. It's just as possible it was in the roadway just before the area of impact, as off the roadway?
>
> A. That's not impossible, no.
>
> Q. It's just as possible the bicycle took evasive action off the roadway and put itself, unfortunately, directly in the path of the van which was off the roadway?
>
> A. That's possible.
>
> Q. Yesterday, Jimmy Ray White, in his opinion, believed the van was coming from – excuse me, the bicycle was coming from west, First Street West, down Central Avenue in the direction of where I am at. Karen Louque, said that the bicycle was traveling from where I am at down towards First Avenue. I will tell you they said the opposite directions.
>
> A. Right.
>
> Q. You don't know which one of those is true, based on your investigation, do you?
>
> A. No, I don't, but it is irrelevant to me.

*Id*. at 673. Roufa explained it was not relevant to him because "the fact that the collision occurred off of the roadway is what's important" as "[t]he van has no reason to be off the roadway." *Id*. Cross-examination continued:

> Q. If the what looks like a pick-up, but we realize it is a car, if the car is parked in the center over this center line, it occupies, if it is in that position, more room than is left on that roadway for the van to go by and stay on the road; isn't that correct?
>
> A. That would be correct, yes.
> Q. Now, if the van is trying to get away from these people, and they have the road blocked because they are parked in the center of it, isn't that a logical reason why they might go off the roadway?
>
> A. Had the scenario that you described in these events specifically occurred here and nothing else that I learned about what happened, yes.
>
> Q. It would be as consistent if the van was parked – excuse me, the car parked in the middle and the van is over here, that it could back up, backing into this lane and still make the same trajectory as you have already talked about with me?
>
> A. That would be possible, yes.

*Id*. at 674-75. Defense counsel questioned Roufa about his interview with White. *Id*. at 675. On redirect, the prosecutor elicited the following testimony from Roufa:

> Q. Even without eyewitness testimony, if there were no eyewitnesses in this case, but you tracked the blood trail back here and found the bicycle, the point of impact –
>
> A. Yes.
>
> Q. – the body and the van, even –
>
> A. Yes.
>
> Q. – without any eyewitness testimony that dealt with the placement of the vehicles before the crash –

A. Yes.

Q. – would you still be able to determine that the defendant's van ran over Raymond Sellers and killed him?

A. Yes, I would.

*Id*. at 704.

Finally, Lisa Flannagan, M.D., an associate medical examiner, testified at the trial that she performed the autopsy on Sellers. Doc. 18 Ex. F at 593-96. Dr. Flannagan testified as to the injuries Sellers had sustained and that he had asphyxiated. *Id*. at 598-612. She testified that none of the injuries were immediately fatal and that Sellers was alive during at least some of the time he was being dragged by Berry's van. *Id*. at 612-13.

Given all this testimony, as the state post-conviction trial court found, any decision by defense counsel not to proceed on a theory that the victim had already been hit by someone else, and was dead when the Defendant struck him, constituted a matter of strategy. Nothing in the record indicates this was an unreasonable decision. Moreover, as the foregoing summary indicates, defense counsel did, contrary to Berry's argument here, point out during cross-examination of the State witnesses, the discrepancies concerning the vehicle containing the three witnesses. And in closing, defense counsel at least alluded to the possibility that Sellers was already on the ground when Berry's van ran over him. *See* Doc. 18 Ex. G at 901-02 (defense closing: "The medical examiner did not testify that there were tire tracks on Raymond, as if a tire ran over him. There was the blood in the area where somehow Raymond's body got

wedged, stuck, whatever the word would be, between the – inside the tire well. . . . We have something that produced Wayne – excuse me, Raymond getting stuck under it. It is entirely consistent that he was on the ground and somehow – and Wayne is driving, his vehicle is driving, and he gets lodged – Raymond gets lodged underneath there.”).

Based on the foregoing, Berry has not shown the state courts’ rulings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

**Ground 3: IAC – Failure to Object to Improper Closing and Misconduct of Prosecutor**

In his third ground, Berry asserts his trial counsel provided ineffective assistance because he failed to object to improper closing arguments and misconduct of the prosecutor. Doc. 10 at 5. Berry states that during closing, the prosecutor made improper arguments that influenced the jury, disparaged the defense theory, sought sympathy, and argued facts not in evidence. *Id*. Berry asserts that defense counsel did not recognize these errors, which affected the fundamental fairness of his trial. *Id*.

Respondent indicates that Berry raised this as his fifth ground in his state Rule 3.850 motion. Doc. 18 at 10. Respondent explains that in that motion, Berry quoted particular remarks by the prosecutor, but in his § 2254 petition, Berry has not identified any particular remarks. *Id*. at 11. Respondent asserts that such a conclusory presentation is legally insufficient to raise a constitutional issue before this Court. *Id*.

Respondent indicates that Berry does quote three phrases out of context: "He is not a genius," Ex. H at 938; "[H]e has the gall to sit there," Ex. H at 942; and "[I]t is a defense of excuse," Ex. H at 945. Doc. 18 at 11-12. Respondent argues these remarks were proper, interspersed with rebuttal linked to the evidence, and within the wide latitude afforded in closing; further, even if improper, the remarks did not result in a denial of due process. *Id*. at 12-13.

In reply, Berry asserts that he "clearly cited to the appropriate Appendix, and the specific page numbers of the trial transcripts and Appendix where the prosecutor interjected improper comments and misconduct." Doc. 19 at 8. Berry further asserts that, in his memorandum, he "specified the particular misconducts and improper comments made during those Appended portion of the trial transcripts." *Id*. at 8-9. Berry states, "in an abundance of caution, if this Court deems necessary that Petitioner 're-quote' the complained prosecutor misconduct listed within this Ground of Petitioner's Rule 3.850, Petitioner prays this Court grant leave to amend this Ground Three." *Id*. at 9. Berry states that he "continues to rely on the supporting authority cited in the Rule 3.850, Petitioner's Writ, Memorandum, and herein this instant Reply that his due process rights were breached in totality of the complained prosecutorial misconduct which permeated the entire atmosphere of Petitioner's trial." *Id*. at 10.

In ruling on this claim, raised as Ground Five in Berry's Rule 3.850 motion, the state post-conviction trial court found:

> The Defendant alleges that the conduct by the prosecutor during closing argument was improper. The Defendant points to numerous comments made by the prosecutor and the fact that the prosecutor put up

> pictures of the injured victim during closing argument. The argument is without merit. First, the Defendant has failed to show how any objection by counsel would have resulted in a different result in the trial. Therefore, the Defendant has failed to show prejudice as required under the Strickland standard. Additionally, the Florida Supreme Court in Porter v. State, 788 So. 2d 917 (Fla. 2001), makes clear that issues related to prosecutor misconduct could have been raised on direct appeal and, therefore, are procedurally barred. See also Reaves v. State, 826 So. 2d 932 (Fla. 2002) (holding that a defendant's claim that the prosecutor made improper remarks in closing is an issue that should have been raised on direct appeal). Regardless, upon review of the transcript, this Court concludes the prosecutor's comments in closing were not improper. Therefore, any objection by counsel regarding these statements would have been without merit. Accordingly, this argument lacks merit and counsel cannot be ineffective for failing to raise a meritless claim. Dailey, 965 So. 2d at 38. Hence, Ground Five is **DENIED**.

Doc. 18 Ex. T at 92. These rulings were affirmed on appeal and are entitled to deference. In Florida, both the State and the defense have wide latitude in closing arguments. *See* Ford v. State, 802 So. 2d 1121, 1129 (Fla. 2001). Assuming Berry challenges in this § 2254 petition the same remarks he challenged in his state Rule 3.850 motion, review of the record does not indicate the prosecutor's comments, even if questionable, rose to such a level as to result in an unfair trial or deprivation of due process. *See, e.g.*, Darden v. Wainwright, 477 U.S. 168, 181 (1986) (finding that prosecutor's comments "undoubtedly were improper," but that was not enough for habeas corpus relief as the question was whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

In particular, the first comments by the prosecutor that Berry takes issue with, in bold below, concern the testimony about BAL testing and how the prosecutor explained the State met its burden:

> Regarding the second element, the blood alcohol level, Doctors' Memorial Hospital took his blood and determined it to be 189.6 as a serum blood level.
>
> All right. We called Dr. Goldberger in, and in addition to calling the two women from the hospital. Now, the purpose from calling the two women from the hospital are, first of all, Ms. [Glennis] Louque, what did she tell you? That they have procedures that they follow to make sure that what they do is accurate. That they have equipment that's approved, that is tested, that is verified, that is maintained.
>
> In fact, we even heard that Cora Hernandez was doing some of the routine maintenance prior to getting the call for this, that they have this equipment that provides test results that are used by doctors in making diagnoses and treatment options, sometimes even in life and death situations.
>
> You don't want to mix medications, or some medications, obviously, that you can't give to somebody who has a lot of alcohol. The doctors need to know this stuff. It is important for them to be accurate with it.
>
> **The defense made a big point of the chain of custody issue. I think Dr. Goldberger pretty well cleared that up.** That's very common, but the chain of custody is the paperwork trail.
>
> What is our chain of custody here? We have a chain of custody of exactly one link. Ms. Hernandez took the blood from the defendant's arm and carried it herself to the laboratory where she performed the test. That's a chain of one link.
>
> So chain of custody is not an issue, and that does not have anything to do with the validity of the results. **But interestingly enough, even though it says here, you know, not to be used for legal purposes**, and they make a point of telling you how to use it for legal purposes.

Doc. 18 Ex. G at 858-59 (emphasis added). These remarks constitute fair comment on the BAL evidence presented and counter the defense position that a chain of custody had not been documented and that the report itself contained a statement that it was not to be used for legal purposes.

The next comments by the prosecutor that Berry takes issue with, in bold below, involve the prosecutor's explanation of how the State met its burden in Count 2:

> Count two is leaving the scene of an accident involving death or injury. The elements that we are talking about here, the defendant was the driver of a vehicle involved in an accident resulting in death of a person.
>
> That particular element is proven. There is no question that he was driving the van, and the van killed Raymond Sellers. There's no question that he was the driver of the accident, involving the death of Raymond Sellers.
>
> The defendant sat here and told you, he didn't know that he had run over the defendant – or the victim. Well, the element is not that he knew. It is knew or should have known. What does that mean, knew or should have known. What is reasonable?
>
> Should a driver know that they have run over somebody? Yes. Are the circumstances of this particular collision such that any reasonable person would know that they had been involved in a collision?
>
> The third element, defendant knew or, again, should have known of the injury or death of the person. If somebody, a driver hits somebody with their van, big Econoline van, full size van, they hit a pedestrian or a bike rider with the van, isn't it reasonable to think that the person may be injured.
>
> **Isn't that one of the reasons that we as drivers are required to stop at the scene. That's one of the requirements. Why? To make sure that nobody is injured, or if they are, that we do something about it.**
>
> Now, I asked you when I – the defendant was testifying, asked Mr. Murphy over there to bring the bicycle out here. And I asked him to stand behind it. That's a man and a bicycle. Look how big he is. Look how big the bicycle is. Is there any reason to believe that the defendant did not know or should not have known of the accident, and the likely injury of the defendant (sic), that he knew or should have known of the injury or the death.

He does not have to know he killed somebody. H has to know that – knew or should have known of the injury or the death of the person. Running into a pedestrian with a van is likely to cause injury.
That the defendant willfully failed to stop at the scene of the accident or as close to the accident as possible and remain there until he had given identifying information to the injured person, and to any police officer investigating the accident.

The judge will give you some definitions later on about some of this, but, did he stop at the scene? No. Was it a willful fail to stop? Absolutely.

Remember this crash was loud enough that people in another car behind him heard it, stopped and turned around, and saw the bicycle. Now, they were not even in the vehicle that would have felt it.

Failed to stop or, failed to render reasonable assistance to the injured person if such treatment appeared to be necessary, or was requested. Obviously, in this case, there could have been no request.

**Would this type of a collision be reasonable to believe that some assistance is necessary? Absolutely. Should he have known? This is what he left behind at he scene.**

And you saw the bike. You saw the size of the bike. Look how mangled the parts of the bike are here. Do you really think that the defendant could have done this damage to this bicycle and not known? That is totally absurd.

The judge is going to give you some of these other definitions, one of which is reasonable assistance, includes carrying or making arrangements to carry the injured person to a physician or hospital for medical treatment.

Did Alvin Wayne Berry do this for Raymond Sellers? No. Reasonable assistance means you stop, and you try to help. You don't make it worse by dragging the man a half a mile through town. And remember, these injuries were not immediately fatal. Raymond Sellers lived for some time.

There were other people at that scene. Had he stopped at that scene, could Raymond Sellers have been saved? We don't know. Nobody will ever know. But what we do know is that man over there

> prevented Raymond Sellers from having any chance whatsoever of having been saved.
>
> With those other people there, could the van have been gotten off of Mr. Sellers? Could he have been pulled out from under, could he have been saved? Who knows?
>
> All we know is, Alvin Wayne Berry prevented us from ever knowing, **because his idea of reasonable assistance is to dump Mr. Sellers like so much garbage on the side of the road**.
>
> And that, ladies and gentlemen, establishes all of the elements of leaving the scene involving a death.

*Id*. at 862-66 (emphasis added). Again, these comments are fair considering the evidence presented and the defense theory that Berry did not know he had hit Sellers.

The next set of comments Berry challenges include the following which appears to be the prosecutor recounting the circumstances of the accident:

> ● " . . . until finally he decides to go off the road, where the body is dislodged, and leave that behind, which today is marked with that [referencing a photograph]. (T. 874)."
>
> ● ". . . have you ever gotten a branch caught underneath your van? . . . he said you would know you hit something. He said you would when you hit a opossum. . . . Mr. Sellers is a good bit larger than a opossum. You can imagine that he count not have known that something that big was being dragged. Probably everybody who has ever driven a car has at some point picked up some debris under the car. What is that irritating noise, as it scrapes along the pavement . . . . (T. 876)."

Doc. 18 Ex. S at 50-51. The transcript pages (874-876) containing these comments are missing from the record; however, a fair reading is that the prosecutor has continued to comment on the evidence presented and the defense theory that Berry did not know he had hit Sellers.

Berry also challenges the prosecutor's comments on Berry's conduct after the accident:

> **Poor me. I have been beaten up.** That's his concern.
>
> You saw the photographs. You saw the blood on his face. Yup, he was beaten up. Jimmy [Ray White] definitely got the best of him. Are those life threatening injuries? No. He was treated and released and booked in the jail.
>
> You saw the pictures of his face and his blood streaming down. His eyes were clear. You don't see huge amounts of blood covering his eyes. Sure, he looked like he had been beaten up. But he could see. He could see well enough to drive. . . .

Doc. 18 Ex. G at 877 (emphasis added).

Berry also takes issue with comments the prosecutor made in rebuttal:

> Let me start near where Mr. Castleman [defense counsel] ended, and that is **talking about these lessers offenses. I didn't talk to you about those during my first time up here, because although you must be instructed on them, and therefore, you can consider them; they don't apply**.
>
> They don't apply because a man is dead, and the lessers are all of DUI manslaughter. He is guilty of DUI and he is guilty of DUI manslaughter in this case, because the evidence is overwhelming that he caused or contributed to the death of Raymond Sellers.
>
> **You see, if you believe from the defense side that the defendant is at most guilty of DUI and not DUI manslaughter, then, basically that means that this entire deadly collision was caused, caused by Raymond Sellers, either a bicyclist or pedestrian who was in the grass.**
>
> I said either, because as it was made clear from the trooper's testimony, we don't know if he was actually moving. So we don't know if he was riding from the bar on his way home, or to the bar on his way to work, or whether or not he was stopped watching the fight.

> What we do know is that he was in the grass. **We know that the van hit him.** And we do know that the drivers are responsible for knowing what's in front of them.
>
> What part of the van had the DNA, had the blood inside the right front tire, and that cross member right by the tire. **Remember the picture of the front of the van?**
>
> Okay. What does that mean? **That means he hit him straight on.** He didn't side swipe him, back in a blind spot where he would not see. He hit him straight on, **and he doesn't know he hit him?**

*Id*. at 933-35 (emphasis added). Berry complains these comments are prejudicial to him and misled the jury. These comments are, however, fair argument considering the evidence presented and the charges involved.

Additional comments Berry challenges concern the prosecutor criticizing the defense theory:

> **The defense started by saying let's put Mr. Sellers' death in perspective. By all means, let's put Mr. Sellers' death in perspective, because the theory of the defense, as you heard from the defendant himself, does not put Mr. Sellers' death in perspective at all; it is a defense of excuse. Not legal excuse or justification but excuses.**
>
> This is somebody who is avoiding responsibility. **This is somebody, a nine-time convicted felon, who is attempting to avoid getting caught for something.** He is, he has just been beaten up. He is leaving hurriedly. **He has this collision, and then, he has got to be saying to himself a real big, oh, darn.** And he keeps going, while he tries to figure what the heck to do.
>
> **Finally, he has to get rid of what is underneath the van, and he pulls off the road and dislodges it, and then he keeps driving.** But he sees Keith [Peacock], ah-ah, how fortuitous, he sees Keith. He wasn't intending on going there probably, but he saw Keith.
>
> There is his idea. He sees Keith, he waves to him, and he goes to Keith's. He does not park where he has always parked before when he

has gone there drinking with Keith. Instead, he parks around the back, behind the dirt pile, behind the hole, behind the R.V., a place where it was not visible from the front.

Now, Mr. Castleman says, it is not really smart. Well, that's true, that's not smart. **Nothing the defendant did was smart. He sat here today, we could tell, he is not a genius, just from the way he conducted himself today.**

*Id*. at 937-38 (emphasis added). Berry complains that the prosecutor was insulting him in front of the jury. Again, however, this appears to be fair argument considering the evidence, charges, and theory of defense.

Berry points to additional comments criticizing the defense theory:

**First of all, what happened back at the scene with Jimmy and all that, again, has nothing to do with Raymond Sellers' death.** That's just what put them there on Central Avenue.

But, even his own testimony is, he knew he hit something. Therefore, he admitted leaving the scene of an accident. He has admitted that element. He's admitted it himself by saying he thought he hit the door, is what he claimed.

. . . .

He has the van hidden, so then he goes to Pam's. Okay. I have to call Chuck. You know, we've got to reach Chuck. And he told you that there were two calls to Chuck and the first one was right about 8:00 o'clock.

**Now, that means within what, 12 to 15 minutes of having run him down, he has fled the scene**, hidden the van, gone home, and now he is contacting the person he is counting on to help him get out of this. And did he know or should – what should he have known that he was in a crash? Yes, clearly. **Daylight, a whole man, a whole bicycle, and he hit them both. We know he hit them both.** It's not just one bumping into something.

. . . .

> The man was under the van. He dragged him. We talked about, have you ever had a branch under the vehicle kind of thing that I asked the defendant himself, have you ever had a branch under the vehicle. Yeah, and he knew it.
>
> . . . .
>
> This bicycle alone shows you that he should have known he was involved in this crash. Mr. Sellers' body alone should let you know. **We have an entire human being that he has hit from the front of the vehicle, that's underneath, and he has the gall to sit there and tell you he doesn't know it.**

*Id*. at 939-42 (emphasis added). Again, this is fair argument considering the evidence, charges, and theory of defense. *See, e.g., id.* at 880 (defense closing: "Now, the prosecutor has indicated it does not matter what Wayne was doing, it only matters about the bicycle and it only matters about tire tracks off the road. But that's not true."), 900-01 (defense closing: "I am not trying to lay a lot of blame on Raymond Sellers. I am telling you that there are unknowns, and that you can't just leap from the unknowns to deciding that Wayne knew he hit this bicycle or should have known, or any of those terms, because of the little bit of damage.").

Berry has not shown that counsel was deficient for failing to object to the prosecutor's statements or that, absent those statements, the outcome of the trial would have been different. *See, e.g.*, Land, 2008 WL 816707 at *19. Berry has not established that the state post-conviction trial court's determination is contrary to or an unreasonable application of Supreme Court precedent. This ground should be denied.

**Ground 4: IAC – Preventing Berry from Viewing State's Evidence**

In his fourth and final ground, Berry asserts that defense counsel prevented him from having the opportunity to view the State's evidence against him, thereby precluding him from assisting in his defense. Doc. 10 at 5. Berry states that during the trial, the State used a projection screen to present visual evidence and, during that presentation, Berry told his attorney that he was unable to see the presented evidence. *Id*. Counsel answered, "I'm your attorney, you don't need to see it," and then counsel proceeded to another part of the courtroom to view the evidence. *Id*. Berry indicates he inquired about the contents of the evidence "but hostile counsel refused to answer." *Id*.

Respondent relies on the state post-conviction trial court's denial of relief on this ground, raised as the third ground in Berry's Rule 3.850 motion. Doc. 18 at 13. Respondent points out that Berry offers nothing to refute that court's findings. *Id*. at 14.

In reply, Berry asserts that "under the penalties of perjury [he] swore that his visual of the projector was obscured enough to alert his defense counsel, whom failed to rectify his clients rights to challenge the evidence presented against him." Doc. 19 at 10. Berry reiterates that "he was prevented from viewing the projector screen when critical evidence was being presented to the jury." *Id*. at 11.

Berry raised this as the third ground in his Rule 3.850 motion. *See* Doc. 18 Ex. S at 38-41. In denying this ground, the state post-conviction court made the following findings:

> In Ground Three, the Defendant argues that throughout the trial, the State used a number of exhibits that were displayed on the projection screen in the courtroom. The Defendant argues that from where he was sitting, he was unable to view these exhibits. When he complained about this to counsel, the Defendant asserts counsel responded, "I'm the lawyer,

> you don't have to see it." Counsel then proceeded to stand up and move to get a better view of the screen. After counsel returned, the Defendant asserts counsel refused to convey what was contained in the evidence. Therefore, the Defendant contends counsel was ineffective. This argument is without merit.
>
> First, by failing to show a reasonable probability that, but for counsel's refusal to allow the Defendant to view the evidence, the result of the proceeding would have been different, the Defendant has failed to meet the "prejudice" prong of the Strickland standard. Moreover, even assuming that this is [sic] in fact occurred, the decision on whether the Defendant could move about the courtroom to view the evidence would be of the Court's, not counsel. Third, "[c]onsidering the overwhelming evidence, no reasonable probability exists that the defendant's inability to walk around the courtroom to view exhibits affected the jury's verdict." Hendrick v. State, 6 So. 3d 688, 693 (4d DCA 2009). Finally, under Ground Five of the Defendant's motion, the Defendant argues it was improper for the prosecutor to display pictures of the victim on a projection screen during closing argument. Specifically, the Defendant states that "these photographs were not simple polaroids, but clear, precise, forensic – and shown on a large projector screen . . . " *Motion* 50. Hence, the assertion that the Defendant was prevented from viewing evidence on the projection screen does not appear to be genuine. Accordingly, Ground Three is **DENIED**.

*Id*. Ex. T at 91.

A review of the record reflects that, just before the trial started, defense counsel explains: "Mr. Phelps [the prosecutor] and I have covered that in the opening, he is going to use visual aids and so I am. He and I have both discussed that before it starts, where there's no surprised or one side or the other jumping up and interrupting." Doc. 18 Ex. C at 202. Nothing else in the record appears to reflect any question or concern about the visual aids or projection screen; both sides used visual aids in the presentation of their cases. Berry does not explain how, assuming he did not have a clear view, the trial would have been different if he had a clear view of the exhibits on

the projection screen. Nothing indicates the state court's adjudication of this claim resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). This ground should be denied.

## Conclusion

For the reasons stated above, Berry has not shown entitlement to habeas corpus relief. Accordingly, the amended § 2254 petition (Doc. 10) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the U.S. District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner cannot make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the Court should deny a certificate of appealability in its final order. Leave to appeal in forma pauperis should also be denied, as an appeal would not be taken in good faith. *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

The second sentence of Rule 11(a) provides that "[b]efore entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Petitioner shall make any argument as to whether a certificate should issue by filing objections to this report and recommendation.

## Recommendation

It is therefore respectfully **RECOMMENDED** that the amended § 2254 petition for writ of habeas corpus (Doc. 10) be **DENIED**, a certificate of appealability be **DENIED**, and leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 11, 2014.

**s/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**